UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11894-RGS

MARYANN GAUDET

v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

July 5, 2012

STEARNS, D.J.

Appellant Maryann Gaudet seeks review of a final decision of the Commissioner of Social Security that she is not disabled as defined by the implementing regulations of the Social Security Act. *See* 20 C.F.R. § 404.1520(f). After an evidentiary hearing, Administrative Law Judge (ALJ) Judith Stolfo determined that while Gaudet is unable to perform her past relevant work, jobs exist in significant numbers in the national economy that she can perform.[1] The Decision Review Board affirmed the decision of

---

[1] The hearing was on February 15, 2011. The ALJ's decision was not immediately final because Gaudet's case was selected for review by the Decision Review Board.

the ALJ. Gaudet seeks review of the Commissioner's decision in this court as provided by 42 U.S.C. § 405(g). The Commissioner, for his part, cross-moves for an order affirming the final decision. The issues on appeal are whether: (1) the ALJ's finding that Gaudet retained the residual functional capacity (RFC) to perform sedentary work is supported by substantial evidence; (2) the ALJ correctly applied the five-step protocol in light of the hypothetical she posed to the vocational expert; and (3) she exhibited an unwonted bias against Gaudet.

## BACKGROUND

Gaudet was born in 1964. She was 43 years old at the time of her initial application for disability benefits in March of 2008. She lives with her husband and her three adult children. At the hearing before the ALJ, Gaudet testified that she was a high school graduate and had done "some college and nursing." Administrative Record (R.) at 29. She worked as a medical assistant in a doctor's office for four years, but testified that she had lost her job in March of 2008 when, overwhelmed by the pressure of the work, she made a mistake calling in prescriptions.

Gaudet suffers from degenerative disc disease in her lumbar spine. She testified that she has herniated discs at the end of her tail-bone and in her neck. She claims that she injured her back in early 2008 while lifting an air conditioner, following which she presented to the emergency room at a local hospital where she was diagnosed with an

injury to her sacroiliac joint. She was prescribed muscle relaxants. She requested and was given an alternate day's work schedule, after complaining that she needed to spend each day following work in bed because the job required her to stand in one place for long periods of time, aggravating her back. She also listed endometriosis[2] and pelvic pain as disabling impairments. Gaudet testified that she stopped seeing a gynecologist after undergoing a hysterectomy, but that she sees her family doctor for her pelvic pain. Before training as a medical assistant, Gaudet worked as a secretary in a hospital setting and as a cashier in a retail business. R. at 28.

Gaudet also claims to suffer from major depressive and anxiety disorders. She states that her depression began in early 2009, several months after she lost her job as a medical assistant. Gaudet testified that her depression suppresses her enjoyment of interests, like gardening. She claims she is no longer physically able to continue her hobby of painting because it requires sitting for a long time. She states that she can, to a limited degree, prepare meals, do laundry, light sweeping, and shop for groceries, although her husband does most of the shopping because she is unable to lift and carry bags. She also needs help with household chores such as laundry and changing sheets.

---

[2] Endometriosis is an ectopic occurrence of endometrial tissue (inner layer of uterine wall), "frequently forming cysts containing altered blood." *See Stedman's Medical Dictionary* 570 (26th ed. 1995).

In the past few years, Gaudet has gained over 100 pounds because she no longer has the desire to "eat good." R. at 44. She testified that she has difficulty in social settings because she has "such a low self-esteem about myself . . . . I just don't like being around a lot of people." *Id*. at 46.

*Medical Treatment*

An MRI of Gaudet's lumbar spine performed on January 4, 2007, revealed dissection of the L4-5 disc, conus ends at L1-2, mild broad-based disc bulge and osteophyte[3] complex with a small central disc protrusion without significant mass effect at L4-5, and mild type I end plate[4] changes. An electrodiagnostic study done on March 17, 2008, found evidence

> for a multi-level diffuse polyradiculopathy involving bilateral L1-S1 nerve roots, worse on the left side. There is more lower extremity involvement on the left than the right with upper roots more involved than lower roots. The process does appear to be acute o[r] chronic in nature but more predominantly with acute nerve damage.

R. at 256. Gaudet underwent another MRI on April 18, 2008, that revealed a mild degenerative change at L4-L5, small circumferential disc bulge at this level, mild

---

[3] Osteophyte is defined as a "[a] bony outgrowth or protuberance." *Stedman's* at 1270.

[4] End plate is defined as "[t]he ending of a motor nerve fiber in relation to a skeletal muscle fiber." *Id.* at 572.

4

bilateral neural foraminal narrowing, and no significant canal stenosis,[5] normal alignment, and no acute compression deformity.

Gaudet began treatment with her family doctor, Kim Houde, M.D., on July 10, 2006. On July 31, 2008, Dr. Houde observed that Gaudet was doing well with her pain. Dr. Houde noted that Gaudet appeared well, and was in no apparent distress, but was obese and experiencing tenderness at the right mid-costal[6] condyle[7] junction. Because Gaudet had complained of chest pain, Dr. Houde ordered a stress test and echocardiogram, as well as a pulmonary function test. The stress echocardiogram was normal. The pulmonary function test revealed no ventilatory defect, no evidence of airway obstruction or restrictive ventilatory defect, and a mildly decreased diffusing capacity. Gaudet has been taking Oxycontin for eight or nine years. In addition, she has been taking Dilaudid for breakthrough pain for the past two years. Gaudet has been a patient of Edison Wong, M.D., a pain specialist, since March 4, 2008. Dr. Wong opines that she is "totally disabled from her chronic lumbar and pelvic pain from

---

[5] Stenosis is defined as "[a] stricture of any canal . . . ." *Stedman's* at 1673.

[6] Costal is defined as "[r]elating to a rib." *Id*. at 403.

[7] Condyle is defined as "[a] rounded articular surface at the extremity of a bone." *Id.* at 380.

significant multilevel bilateral lumbar radiculopathies[8] as seen by objective EMG testing." R. at 453.

In addition to pain medicine, Gaudet has been receiving injections every one to two months, which she says help for a couple of weeks. During those weeks, she claims she still can not do much because of her pelvic pain. On January 4, 2007, an MRI of her pelvis was within normal limits. On March 5, 2007, a pelvic ultrasound found a negative postoperative pelvis. Gaudet said that she can not have surgery for her back, because "mentally I can't do it because I've had so much surgery." *Id.* at 34. She recounts that she has had three hysterectomies, three c-sections, her appendix taken out, and two to three exploratory surgeries. R. 34-35. She said that her doctors would like her to start massage therapy, though there is no evidence in the record that Gaudet has complied. She twice went to physical therapy three years ago, but said it made her back worse.

On April 13, 2009, Gaudet complained of pain across her foot. An x-ray from April 13, 2009, showed no significant abnormality in Gaudet's right foot. On May 21, 2009, an x-ray of Gaudet's left lower leg found no fracture, subluxation,[9] or dislocation.

---

[8] Radiculopathy is defined as "[d]isorder of the spinal nerve roots." *Id.* at 1484.

[9] Subluxation is defined as "[a]n incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains." *Stedman's* at 1693.

*Mental Health Treatment*

At a follow-up appointment for her chronic pain with Timothy Eddy, D.O., Gaudet was given a prescription for Oxycontin. Gaudet admitted to altering the number of pills on the prescription before having it filled, a criminal act that she attributed to "stress." Eddy advised Gaudet to seek therapeutic counseling. Eddy observed that Gaudet appeared receptive to the idea of counseling, and told him that she would make it a priority.

After Gaudet applied for disability benefits, Disability Determination Services referred her to Mark Brooks, Ph.D., for a consultative exam, which was performed on December 4, 2008. Gaudet told Dr. Brooks that she had no history of inpatient psychiatric treatment, and that although she had been treated with Cymbalta and Xanax for four years, she was still experiencing symptoms of anxiety and depression. Her speech rate, rhythm, and volume were noted to be normal, and she was able to recall at least seven digits forward, which is normal, and four digits backwards, with is slightly below average. Dr. Brooks hypothesized that Gaudet's difficulty with recalling digits backwards was attributable to problems with sustained concentration and mental tracking as a result of the interfering effect of anxiety and depressive symptoms. He found Gaudet to be cooperative and appropriate in dress and grooming, with a somewhat anxious affect, and able to respond adequately to simple questions related

7

to abstract thinking, social judgment, and problem solving. Dr. Brooks recommended that Gaudet participate in medical, psychiatric, and psychological treatment for her depressive and anxiety disorders.

On April 13, 2009, Dr. Houde found that Gaudet's anxiety was stable. Dr. Houde examined Gaudet on November 10, 2009, February 2, 2010, and July 20, 2010; on each occasion finding her mood and affect appropriate to the situation. Gaudet saw Theresa Gachuna, a licensed social worker, on February 17, 2010. Gachuna observed that Gaudet appeared sad; was cooperative, tearful, and made good eye contact; exhibited good concentration and judgment; had speech and thought processes within normal limits; exhibited a tearful/appropriate affect; and was not experiencing any delusions or hallucinations. She recommended that Gaudet attend therapy once a month. Gaudet saw Gachuna again on March 31, 2010, and June 9, 2010. Gachuna reported no significant change in Gaudet's mood/affect, thought process/orientation, behavioral functioning, or medical condition. Three months later, at a further appointment with Gachuna, Gaudet reported that it had been difficult for her to leave her house, and that her stress was worsening. Gaudet testified at her hearing that she missed appointments with her therapist because of the $30 co-payment. As the ALJ noted, when Gachuna made her psychological evaluation, she was not aware that Gaudet was taking heavy doses of narcotic pain medication.

8

*ALJ's Decision*

Under the "sequential step analysis" set out in 20 C.F.R. § 404.1520, the ALJ must first determine whether a claimant was gainfully employed prior to the onset of any disability. At the second step, the ALJ must determine whether the claimant suffers from a severe impairment limiting his or her ability to work. If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of the regulations, the claimant is presumptively deemed disabled at step 3. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove that her disability is sufficiently serious to preclude a return to her former occupation. If the claimant meets this burden, the Commissioner at the final step in the analysis is obligated to prove that there are other jobs in the national economy that claimant could nevertheless perform. *Gonzales Perez v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 886, 888 (1st Cir. 1978).

The ALJ found that Gaudet met the insured status requirements of the Act through December 31, 2012, and that she had not engaged in any substantial gainful activity since March 5, 2008, the alleged onset date of her impairment (Step 1). At Step 2, the ALJ found that Gaudet had a number of impairments: degenerative disc disease in the lumbar spine, obesity, major depressive disorder, and anxiety disorder. After establishing that Gaudet's combination of impairments did not meet or equal an

9

entry in the Listing of Impairments (Step 3), the ALJ proceeded with an assessment of Gaudet's residual functional capacity (RFC) preliminary to a determination of whether she lacked the capacity to perform her past relevant work (Step 4). Finding that capacity lacking, the ALJ turned to a determination of whether Gaudet is nonetheless able to perform other work in the national economy consistent with her RFC (Step 5).

At this final step, the ALJ concluded that Gaudet could perform sedentary work, and that she could lift five pounds occasionally and less than five pounds frequently. She could stand/walk for two hours and sit for six hours during an eight-hour day. She would be limited to occasional pushing/pulling with her upper extremities. She could not push/pull with her lower extremities, kneel, crouch, or crawl. She would need to avoid exposure to vibrations and hazards. She could not successfully function in a fast-paced production environment. She would have moderate limitations with respect to concentration, persistence, and pace. Basing her opinion on Gaudet's age, education, work experience, RFC, and the testimony of the vocational expert (VE), the ALJ determined that Gaudet could work as a secretary, cashier, or ticket seller, among other positions that are available in significant numbers in the national economy. Therefore, the ALJ concluded that Gaudet was not disabled within the meaning of the Social Security Act and, as a result, ineligible for benefits.

## DISCUSSION

Judicial review is limited to determining whether the findings of the Commissioner are supported by substantial evidence. *See* 42 U.S.C. § 405(g). *See also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The findings of the Commissioner will be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). However, the Commissioner's findings "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

The Act defines "disability" as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act further elaborates that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

**The ALJ's first hypothetical question to the VE**

Gaudet first contends that the ALJ's hypothetical question(s) to the VE was critically flawed. Gaudet posits that the ALJ erred in eliciting from the VE the opinion that there are jobs in the national economy that Gaudet could perform because the hypothetical question did not fully incorporate Gaudet's limitations as found by Dr. Wong, such as her inability to sustain concentration. The contention is simply not true. In posing the hypothetical to the VE, the ALJ asked: "Let's assume we're dealing with an individual same age, education, past work experience . . . she would have *moderate limitations in her ability to concentrate*, persist, and pace. Could she do her past work?" R. at 53 (emphasis added). In response, the VE testified that Gaudet was capable of doing her prior job as a secretary, or to work as a transcriptionist, cashier, or ticket seller. When the ALJ added the further limitations: "[A]ssume she would be absent more than three days a month and she would have moderate social functioning" to the first hypothetical, the VE responded that she would not be able to do any of the substitute jobs. *Id.* at 54.

Gaudet contends that the ALJ did not adequately consider her severe impairments described in the evidence, and posed in counsel's hypothetical to the VE. Gaudet's counsel asked the question that he argues the ALJ should have asked.

> Assuming the same age, education, work experience that we have evidence for the claimant, would there be any work in the national economy with the following restrictions? Being off task for 25 percent or more of the workday on a daily basis, being restricted to sitting and standing or walking each for a total of two hours in a workday for, in addition to having marked limitations in her ability to maintain social functioning and also marked limitations in her ability to main[tain] concentration, persistence and pace and also with the additional restriction that both her right and left hand impairments would limit her ability to perform gross and fine manipulation tasks for more than 50 percent of the workday.

*Id*. at 54-55. The VE responded (as he did to the ALJ's amplified hypothetical) that if Gaudet's limitations were as counsel stated them, there were no jobs in the national economy that she could successfully perform.

However, the hypothetical posed by counsel was based in a fundamental part on a finding unique to Dr. Wong, that Gaudet had limitations in her ability to use her hands. Although the ALJ did not dismiss the opinion of Dr. Wong altogether, she noted that Dr. Wong's report of a hand impairment was inconsistent with his own records and the other medical evidence. While the ALJ is not to assume the role of a medical professional, she is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians." *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). Where a treating physician's opinion is inconsistent with other substantial evidence in the record, or, with the opinions of other treating physicians, the conflict is for the ALJ – and not the court –

13

to resolve. *Rodriguez*, 647 F.2d at 222. Moreover, the deference usually accorded to the views of a treating physician does not extend to an opinion that a patient is disabled and unable to work as that is a legal and not a medical opinion. *Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 700 n.7 (1st Cir. 2007).

### The ALJ's conclusion that Gaudet had a RFC to perform sedentary work, with limitations

Gaudet next contends that the ALJ erred when she concluded that Gaudet had the RFC to perform sedentary work. According to Gaudet, the ALJ failed to credit the meaningful inferences that could be drawn from her testimony as Social Security Ruling (SSR) 85-16 permits. She also argues that the ALJ did not perform a function-by-function assessment of her physical capacities, nor did she consider her impairments in combination as SSR 86-8 requires.

Again, the argument misses the mark. The ALJ concluded that Gaudet had the RFC to perform sedentary work, with exceptions. She specifically found that the medical record did not support Gaudet's claim that she was unable to perform sustained work activity. In this regard, the ALJ noted that Gaudet made only infrequent visits to her doctors for treatment of her allegedly disabling (and worsening) symptoms, and had never consulted a surgeon or other specialist. A proper RFC assessment is required to address both the exertional (sitting, standing, walking, lifting, carrying, pushing, and

pulling) and nonexertional capacities of a claimant. *See* SSR 96-8. In evaluating Gaudet's RFC, the ALJ clearly applied the function-by-function assessment. She concluded that Gaudet "could stand/walk two hours in an eight-hour day and sit for six hours in an eight-hour day . . . would be limited to occasional pushing/pulling with her upper extremities . . . could never push/pull with her lower extremities, kneel, crouch, or crawl." R. at 13.

Gaudet argues that the ALJ failed to consider her severe impairments in combination, as required by SSR 86-8. Under the regulation, the Commissioner "shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity" to merit consideration. 42 U.S.C. 423(d)(2)(B). *See also McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1126 (1st Cir. 1986). In rebuttal, the Commissioner appropriately relies on this court's decision in *Snow v. Barnhart*, 2006 WL 3437400, at *6 (D. Mass. Nov. 29, 2006) ("the ALJ's comprehensive discussion of [the claimant's] physical and mental impairments" showed that he properly considered the claimant's impairments in combination). *See also Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (holding that an ALJ's review of the medical record may show adequate consideration of the combined effect of a claimant's impairments, even if the impairments are discussed individually instead of collectively).

In this case, the ALJ discussed each of Gaudet's four severe impairments: degenerative disc disease to the lumbar spine, obesity, major depressive disorder, and anxiety disorder, in significant enough detail to satisfy SSR 86-8.

**The ALJ's alleged bias against Gaudet**

Gaudet contends that the ALJ showed an extreme bias against her, particularly in discussing her medication regimen. She alleges that the ALJ berated her for following the treatment plan developed by her licensed physicians, and questioned the wisdom of her treatment choices.[10]

As noted in the Commissioner's brief, a claimant asserting bias on the part of an ALJ has the burden of establishing a disqualifying predisposition on the ALJ's part. *See Schweiker v. McClure*, 456 U.S. 188, 196 (1982). Judicial bias is not inherent in "expressions of impatience, dissatisfaction, annoyance, and even anger, [which] are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Liteky v. United States*, 510 U.S. 540, 555-556 (1994). As the Supreme Court has noted, "[a] judge's ordinary efforts at courtroom

---

[10] Gaudet states erroneously that the ALJ had no support in the record for her conclusion that Gaudet had abused narcotic painkillers, and had used painkillers in a way other than prescribed. Dr. Eddy had written Gaudet a prescription for "20 Oxy IR 5 mg. to be taken 1-2 q.i.d. p.r.n" on June 1, 2007. R. at 237. The pharmacy alerted Dr. Eddy to the fact that Gaudet had altered the prescription to read 120 pills (to which she later confessed).

16

administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune" from being cast as a judicial disqualification. *Id.* at 556.

According to Gaudet, the ALJ quizzed her about her medication regimen to undermine her credibility. Gaudet argues that under SSR 96-7P, credibility is not at issue when there is an underlying impairment that could reasonably be expected to explain a claimant's pain or other symptoms. As the Commissioner states in his reply, the argument is refuted by the applicable regulation itself. Under SSR 96-7P, first, the "adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." If a medically determinable impairment is found, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* In making this evaluation, the ALJ must consider the claimant's credibility "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence." *Id.* This is precisely the course the ALJ followed in concluding that, in significant respects, Gaudet's complaints about her disabling symptoms lacked credibility, and were not supported by objective medical

17

evidence. In making this assessment, the ALJ quite properly took note of Gaudet's dishonesty in uttering a forged prescription for Oxycontin, a Schedule II controlled substance. *See* Fed. R. Evid. 609(a)(2). *Cf. United States v. Kiendra*, 663 F.2d 349, 354 (1st Cir. 1981).

## ORDER

For the foregoing reasons, Gaudet's motion to reverse or remand the decision of the Commissioner is <u>DENIED</u>. The Commissioner's cross-motion for an order of affirmance is <u>ALLOWED</u>. The Clerk will enter judgment for the Commissioner and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

1